MEMORANDUM OPINION
 

 PEPPER, District Judge.
 

 This cause comes before the Court upon Defendants’ Motion for Summary Judgment [56-1]. Having apprised itself thoroughly and exhaustively of the motion, the responses thereto, the accompanying briefs, the controlling authorities, and the underlying facts and circumstances, the Court is prepared to rule.
 

 For the reasons discussed below, the Court concludes that the defendants’ motion for summary judgment should be granted for failure of the plaintiff to present sufficient evidence to prove his claims.
 

 I. FACTUAL BACKGROUND
 

 Daniel Webster Pepper Jr. filed this suit on May 9, 2001 against Defendants International Gaming Systems, LLC, and its former officers, agents, and/or employees Joseph I. Lerner, Stephen Patton, and Charles E. Crosslin. The complaint sets forth seven claims: copyright infringement, misappropriation of trade secrets, breach of contract, tortious interference with business expectancy, aiding and abetting, fraud, and civil conspiracy. All of the claims center around the plaintiffs basic allegation that the defendants stole attributes of his copyrighted computerized bingo software program and incorporated them into their own bingo program “Cadillac Bingo.”
 

 Plaintiff avers that beginning in 1994, he began development of software to computerize games in the bingo industry. Around this time Defendant Crosslin, a former manager of a bingo operation in Tupelo, Mississippi, agreed to assist the plaintiff in this undertaking by providing hardware and funding for the project. According to the plaintiff, however, Defendant Crosslin did not perform satisfactorily and thus Defendant Crosslin dropped out of the undertaking around June 10, 1995, taking back the computer he gave to the plaintiff. Plaintiff avers in his complaint that Defendant Crosslin failed to substantially contribute to the undertaking.
 

 After developing the bingo software on his own, the plaintiff submitted his application to the Copyright Office for registration on October 2, 1995. Plaintiff received his first Certificate of Registration effective November 13, 1995. However, because the Copyright Office made an mistake, the plaintiff received therefrom a corrected Certificate of Registration in June of 1996.
 

 Essentially, the software is designed to perform specific tasks for the user to play multiple bingo games by computer. According to the plaintiff, the software “is an especially efficient application program containing proprietary routines, graphic designs, and unique programming logic. Because of its nature, the Software permits increased volume, productivity, and efficiency for any bingo operation which utilizes it.” Complaint ¶ 16.
 

 On October 21, 1995 (after plaintiff turned in his copyright registration application but before it became effective) Defendant Joseph I. Lerner signed an confidentiality agreement with the plaintiff in Tupelo in which Lerner was to work as a consultant for the plaintiff and Defendant Crosslin. The confidentiality agreement, in its entirety, provided:
 

 I, Joseph I. Lerner, do hereby, agree to work as a consultant for Charles Cross-
 
 *DCCCXCVII
 
 lin and Dan Pepper under the following terms.
 

 All information concerning this project will remain strictly confidential. Fu[r]thermore, I specifically agree not to discuss, refer or in any manner convey any information about this work or project to any individual, party, or company or other project. I also agree not to use, convey or transfer this information in any manner that would compete with this project or its owners which are Charles Crosslin and Dan Pepper. This is a comprehensive and continuing agreement of which I fully understand.
 

 Plaintiff then provided Defendant Lerner with a copy of his software and accompanying notes. During the months of October and November of 1996, Defendant Lerner made additional visits with the plaintiff in Tupelo, requesting and receiving updated graphics and program information. During the first of these four meetings with Plaintiff, Defendant Patton accompanied Defendant Lerner. Plaintiff asserts that these three parties “agreed to proceed to market the program with [the plaintiff] to retain one-half interest in the project and Lerner to share the other half with Patten [sic].” Complaint ¶ 18. Defendants deny the existence of such an agreement.
 

 Defendant Lerner does not deny that he agreed to and did bring potential investors to the some of the meetings with the plaintiff so that the plaintiff could demonstrate the bingo program. Defendants deny plaintiffs assertion that thereafter Defendants Lerner and Patten made multiple assurances to the plaintiff that he would “retain one-half of the revenue from the venture without any further commitment or obligation from the Plaintiff to market and develop the Software.” Complaint ¶ 19. Plaintiff refers to these assurances as promises they would “take care of’ the plaintiff.
 

 By this time, Defendants Lerner and Patten formed Defendant International Gaming Services, LLC for the purpose of marketing and selling the plaintiffs software. Plaintiff alleges that he assisted the defendants by “divulging his secrets, by demonstrating the Software to potential investors, and by complying with each of his requests for assistance in promoting the project, al based upon the assurances made by Lerner and Patten [sic]”’ Complaint ¶ 20.
 

 The gravamen of the instant suit surrounds the plaintiffs two key assertions. First, that the defendants International Gaming Services, LLC and its agents Lerner and Patton “began to produce and market the Software under the name of ‘Cadillac Bingo,’ all in direct violation of the agreement between the parties and of the copyright owned by Plaintiff.” Complaint ¶ 21. Second, that “by making unauthorized copies of the Software, and by distributing those copies and/or derivative computer programs, Defendants have willingly infringed, and continue willfully to infringe, Plaintiffs exclusive rights under the Copyright Act.” Complaint ¶ 22.
 

 Defendants deny these assertions. In their responsive motions and pleadings, the defendants admit that the plaintiff provided them a copy of the software but argue that it was incomplete and it never ran properly. They deny that the plaintiff gave them all of his notes regarding the software. They also deny the validity of the confidentiality agreement, signed only by Defendant Lerner and not by IGS (formed after the agreement) or Patten, and argue that therefore they could neither have breached it nor tortiously interfered with it. Defendants deny further that there ever was a trade secret to misappropriate since the plaintiff freely disclosed to multiple parties what parts of the software he had presented; therefore,
 
 *DCCCXCVIII
 
 there was no secret. They deny that they infringed the plaintiffs copyright by copying. The defendants also argue that the plaintiff cannot prove any of his claims for various reasons, including the lack of an expert or an. expert report to establish elements illegally copied and the inability to prove the exact substance and amount of the plaintiffs program registered at the Copyright Office versus the substance and amount of the current version. Finally, the defendants argue that all of the plaintiffs claims must be denied because time has run out to assert them pursuant to the statute of limitations applicable to each claim.
 

 II. DISCUSSION
 

 A. Summary Judgment Standard
 

 Summary judgment should be entered only if “[tjhere is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.” Fed.R.Civ.P. 56(c). The party seeking summary judgment has the initial burden of demonstrating through the evi-dentiary materials that there is no actual dispute as to any material fact in the case.
 
 Celotex Corp. v. Catrett,
 
 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On motion for summary judgment, “[t]he inquiry performed is the threshold inquiry of determining whether there is a need for a trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.”
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether this burden has been met, the court should view the evidence introduced and all factual inferences from that evidence in the light most favorable to the party opposing the motion.
 
 Id.
 
 Furthermore, “the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party’s case, and on which that party will bear the burden of proof at trial.”
 
 Celotex Corp. v. Catrett, supra,
 
 at 322, 106 S.Ct. 2548.
 

 The summary judgment procedure does not authorize trial by affidavit. Rather, “[cjredibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.”
 
 Anderson v. Liberty Lobby, Inc., supra,
 
 at 255, 106 S.Ct. 2505. Accordingly, a court may not decide any factual issues found in the record on motion for summary judgment, but if such material issues are present, the court must deny the motion and proceed to trial.
 
 Impossible Elec. Tech. v. Wackenhut Protective Systems,
 
 669 F.2d 1026, 1031 (5 Cir.1982);
 
 Environmental Defense Fund v. Marsh,
 
 651 F.2d 983, 991 (5 Cir.1981);
 
 Lighting Fixture & Electric Supply Co. v. Continental Ins. Co.,
 
 420 F.2d 1211, 1213 (5 Cir.1969).
 

 Under the provisions of Federal Rule of Civil Procedure 56(e), a party against whom a motion for summary judgment is made may not merely rest upon his pleadings, but must, by affidavit, or other materials as provided in Rule 56, inform the court of specific facts showing that there is a genuine issue for trial.
 
 Celotex Corp. v. Catrett, supra,
 
 at 324, 106 S.Ct. 2548.
 

 Summary judgment is not proper if a dispute about a material fact is “genuine,” or in other words the evidence is such that a reasonable jury could return a verdict for the non-moving party.
 
 Anderson, supra
 
 at 248, 106 S.Ct. 2505. There is no such issue unless the evidence sufficiently supports the non-moving party’s version of
 
 *DCCCXCIX
 
 the facts for a jury to return a verdict in the non-moving party’s favor.
 
 Id.,
 
 at 249, 106 S.Ct. 2505. The relevant inquiry is whether or not there is sufficient disagreement on the facts to submit them to the jury or whether it is so one-sided that one party should prevail as a matter of law.
 
 Id.,
 
 at 251, 106 S.Ct. 2505. The issue must be genuine, and not pretended, and the evidence relied on to create such an issue must be substantial.
 
 Southern Distributing Co. v. Southdown, Inc., 574
 
 F.2d 824, 826 (5th Cir.1978);
 
 Schuchart & Associates v. Solo Serve Corp.,
 
 540 F.Supp. 928, 939 (W.D.Tex.1982).
 

 B. Statute of Limitations
 

 Defendants argued ably that all of plaintiffs claims are barred under the applicable statutes of limitations, all of which provide for three or less years from notice of claim accrual. They assert that since the plaintiff filed this action on May 9, 2001, he could not have had notice of his claims before May 9, 1998 in order to maintain his suit. If the plaintiff did have notice of claim accrual before May 9, 1998, then the three-year statute of limitations bars all of his claims. The plaintiffs deny this and argue alternatively that any applicable time periods would be tolled due to fraudulent concealment; i.e., that after defendants’ numerous assurances that they would “take care of’ the plaintiff each time he voiced concern his rights were endangered.
 

 The defendants’ arguments are complex but can be boiled down to one dispositive issue: Whether the plaintiff actually saw or should have seen the IGS add for the allegedly infringing bingo program on the back of a bingo trade magazine the plaintiff admits he receives in August of 1997 or 1998.
 

 The defendants ran a full-page add advertising “Cadillac Bingo” on the back of a bingo trade magazine “from July, 1997 through November, 1997, and regularly during the next seven months.” Affidavit of Defendant Lerner ¶ 3. On page 83 of the plaintiffs deposition, the plaintiff states that he first saw the add in August of 1997 — which would mean the defendants would win on their statute-of-limitations argument.. However, on pages 89-90 in the same deposition, the plaintiff says he did not see the add until August of 1998. In that same deposition, the plaintiff admits he received the magazine. However, it is unclear how long he received it; i.e., whether he had been receiving the magazine during the entire period the add ran. The plaintiff avers that he never ordered the magazine and that it was essentially sent to him as unsolicited junk mail. It seems clear that the plaintiff did not know of the statute-of-limitations issue at the time of his deposition and now denies strenuously that he had notice before August 1998. In fact, he produced a copy of the add he received dated on August 1998.
 

 As to the plaintiffs fraudulent concealment argument, the defendants argue that the plaintiff cannot establish the two elements of fraudulent concealment: (1) affirmative acts of concealment; and (2) plaintiff demonstrated due diligence to discover his claims but could not so discover due to the defendants’ acts of concealment.
 

 Ultimately, the issue of the defendants’ core statute-of-limitations argument is one of credibility. With respect to the ad on the back of the magazine, it is a factual issue as to whether the plaintiff actually received and/or saw the magazine issues during the time period the ad ran, whether it is reasonable to assume he should have seen the ad before August 1998, and whether he actually saw the ad in August 1997 or August 1998. Regarding fraudulent concealment, given the nature of each party’s position and motivation, it is a factual issue as to whether the defendants
 
 *CM
 
 affirmative concealed any claims the plaintiff might have by giving him numerous assurances and whether the plaintiff exercised due diligence to discover those claims.
 

 Because the statute-of-limitations argument depends on determinations of credibility, the Court cannot grant summary judgment on this issue since, as discussed above in the summary judgment standards, it is not for the court to weigh credibility. Rather, that job is for the jury.
 

 Thus, the Court must turn to the merits of the plaintiffs claims.
 

 C. Copyright Infringement
 

 1. Copyright Standards
 

 Computer programs are entitled to copyright protection.
 
 Vault Corp. v. Quaid Software, Ltd.,
 
 847 F.2d 255, 259 (5th Cir.1988). The Copyright Act of 1976, 17 U.S.C.A. § 101 defines a computer program as “a set of statements or instructions to be used directly or indirectly in a computer to bring about a certain result.” Protection for copyrights exist:
 

 in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include ... (1) literary works.
 

 17 U.S.C. § 102(a). It is established that computer programs, “even though articulated in object code, is afforded copyright protection as a ‘literary work’ under section 101.”
 
 NEC Corp. v. Intel Corp.,
 
 10 U.S.P.Q.2d 1177, 1989 WL 67434 (N.D.Cal.1989) (citing
 
 Apple Computer, Inc. v. Franklin Computer Corp.,
 
 714 F.2d 1240, 1249 (3d Cir.1983)). The law in the Fifth Circuit also “lends copyright protection to the non-literal as well as the literal elements of computer programs.”
 
 Computer Management Assistance Company v. Robert F. DeCastro, Inc.,
 
 220 F.3d 396, 400 (5th Cir.2000) (citing
 
 Kepner-Tregoe, Inc. v. Leadership Software, Inc.,
 
 12 F.3d 527, 536 n. 20 (5th Cir.1994) (embracing the “noncontroversial proposition that non-literal aspects of copyrighted works — like structure, sequence, and organization— may be protected under copyright law.”)).
 

 Ideas are not copyrightable, only certain original and creative expressions of those ideas. The Copyright Act states this maxim more inclusively:
 

 In no ease does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery regardless of the form in which it is described, explained, illustrated, or embodied in such work.
 

 17 U.S.C. § 102(b).
 

 In order to establish copyright infringement, “a plaintiff must show (1) ownership of a valid copyright and (2) unauthorized copying.”
 
 Peel & Company, Inc. v. The Rug Market,
 
 238 F.3d 391, 394 (5th Cir.2001) (citing
 
 Alcatel USA, Inc. v. DGI Technologies, Inc.,
 
 166 F.3d 772, 790 (5th Cir.1999)). Since it is rare to have direct evidence of copying, “copying may be inferred from (1) proof that the defendant had access to the copyrighted work prior to the creation of the infringing work, and (2) probative similarity.”
 
 Peel & Company, Inc.,
 
 238 F.3d at 394. To demonstrate “access,” the court should consider whether the defendant had a reasonable opportunity to view the copyrighted work.
 
 Id.
 
 In so considering, a court should be mindful that “[a] bare possibility will not suffice; neither will a finding of access based on speculation or conjecture.”
 
 Id.
 
 In the Fifth Circuit, “[i]f the two works are so strikingly similar as to preclude the possibility of independent creation, ‘copying’
 
 *CMI
 
 may be proved without a showing of access.”
 
 Id.
 
 at 395.
 

 2. Abstraction/Filtration/Comparison Test
 

 To prove the unauthorized copying element of copyright infringement, a plaintiff must prove substantial similarity of the two works.
 
 Id.
 
 In
 
 Peel & Company, Inc.,
 
 the Fifth Circuit Court of Appeals wrote that “[t]o determine whether an instance of copying is legally actionable, a side-by-side comparison must be made between the original and the copy to determine whether a layman would view the two works as ‘substantially similar.’ ”
 
 Id.
 
 (quoting
 
 Creations Unlimited, Inc. v. McCain,
 
 112 F.3d 814, 816 (5th Cir.1997)). However,
 
 Peel & Company, Inc.
 
 involved rugs. The instant case involves computer programs which requires a test far more complicated than a simple side-by-side comparison.
 

 In
 
 Computer Management Assistance Company, supra,
 
 a case involving two computer programs, the Fifth Circuit Court of Appeals used the abstraction/filtration/comparison method to determine copyright protection in that case. The court adopted and presented the test as written in
 
 Gates Rubber Co. v. Bando Chemical Industries, Ltd.,
 
 9 F.3d 823 (10th Cir.1993):
 

 First,
 
 in order to provide a framework for analysis, we conclude that a court should dissect the program according to its varying levels of generality as provided in the abstractions test.
 
 Second,
 
 poised with this framework, the court should examine each level of abstraction in order to filter out those elements of the program which are protectable. Filtration should eliminate from comparison the unprotectable elements of ideas, processes, facts, public domain information, merger material, scene a faire material, and other unprotectable elements suggested by the particular facts of the program under examination.
 
 Third,
 
 the court should then compare the remaining protectable elements with the allegedly infringing program to determine whether the defendants have misappropriated substantial elements of the plaintiffs programs.
 

 220 F.3d at 401 (quoting
 
 Gates Rubber Co.,
 
 9 F.3d at 834) (emphasis added).
 

 The abstractions test was first enunciated by Judge Learned Hand in
 
 Nichols v. Universal Pictures Corp.,
 
 45 F.2d 119 (2d Cir.1930),
 
 certiorari denied,
 
 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931). But that test involved the comparison of two theatrical plays, not complex computer programs. In determining copyright infringement of computer programs, the abstraction/filtration/comparison test is the most widely followed.
 
 See,
 
 Peter B. Maggs, John T. Soma
 
 &
 
 James A. Sprowl,
 
 Internet and Computer Law; Cases-Comments-Questions,
 
 151 (West 2001).
 

 a. Abstraction
 

 In applying the abstraction segment of the abstraction/filtration/comparison test, the court “must first divide the [copyrighted computer] program segments into layers of abstraction and determine ‘whether the contents of that segment depicts an idea, process or method, which, inseparable from its expression by other means’ and are therefore not copyrightable.”
 
 Computer Management Assistance Company,
 
 220 F.3d at 401 (quoting
 
 Engineering Dynamics, Inc. v. Structural Software, Inc.,
 
 26 F.3d 1335, 1343 (5th Cir.1994),
 
 opinion supplemented and reh’g denied,
 
 46 F.3d 408 (5th Cir.1995)).
 

 b. Filtration
 

 Next, “[t]he filtration component of the analysis seeks to isolate noncopyrightable elements from each particular level of a program.’ ... Ideas, information, meth
 
 *CMII
 
 ods, scientific discoveries, facts, information in the public domain and
 
 scenes a faire
 
 are not protected.”
 
 Id.
 
 at 402 (citations omitted).
 

 The
 
 scenes a faire
 
 doctrine “excludes from copyright protection work serving functional purposes of work that is dictated by external factors.”
 
 Id.
 
 at 401 In other words, the doctrine of
 
 scenes a faire
 
 excludes from copyright protection facts or ideas that are incidental to a given topic, e.g., the white and black robes worn by characters in a computer karate game would not be copyrightable since such aspects are intertwined with the idea of karate. Another example would be a deer-hunting computer game that featured cross-hairs on a scope. The
 
 scenes a faire
 
 doctrine seeks to ensure that only expressions of original ideas are copyrighted, not the ideas, procedures, processes, systems, methods of operation, concepts, principles, or discoveries proscribed by 17 U.S.C. § 102(b). In the computer program arena, the “external factors [consisting of
 
 scene a
 
 faire] [also] include: hardware standards and mechanical specifications, software standards and compatibility requirements, computer manufacturer design standards, target industry practices and demands, and computer industry program practices.”
 
 Computer Management Assistance Company,
 
 220 F.3d at 401.
 

 Related to the
 
 scenes a faire
 
 doctrine is the concept of merger. The “doctrine of merger denies copyright protection to a work if that work is the only way to express a particular idea ... The expression is viewed as having merged with the idea itself. To allow copyright of the expression would result in a grant of a monopoly over the underlying idea.”
 
 Compaq Computer Corp. v. Procom Technology, Inc.,
 
 908 F.Supp. 1409 (S.D.Tex.1995).
 

 c.
 
 Comparison/Substantial Similarity
 

 Regarding the comparison prong (i.e., determining substantial similarity), the court “must examine whether the defendant copied any remaining protected aspects of [the copyrighted computer program], unrelated to the functional purposes excluded from protection by the
 
 scenes a faire
 
 doctrine — i.e., the source code and file layouts for the program, including all designs revealed by the source code and file layouts.”
 
 Computer Management Assistance Company,
 
 220 F.3d at 401.
 

 3. Conclusion
 

 Clearly, this abstraction/filtration/comparison analysis is far more complex than a simple side-by-side comparison like that discussed in
 
 Peel & Company.
 
 In fact, the Fifth Circuit Court of Appeals in
 
 Engineering Dynamics, Inc., supra,
 
 noted with approval an illuminating law review article that seeks to be a primer for courts and lawyers in determining the proper levels of abstraction. 26 F.3d at 1343 n. 10. In his well-reasoned Note, “Defining Computer Program Parts Under Learned Hand’s Abstractions Test in Software Copyright Infringement Cases,” 91 Michigan Law Review 526 (1992), John W.L. Ogilvie proposes six levels courts should use, in descending order, to effectuate the abstraction prong of the abstraction/filtration/comparison test: “(1) main purpose; (2) system architecture; (3) abstract data types; (4) algorithms and data structures; (5) source code; and (6) object code.”
 
 Id.
 
 at 570. Furthermore, Mr. Ogilvie’s general impression about the case law involving copyright infringement of computer software is “confused, inconsistent, and even unintelligible to those who must interpret it.”
 
 Id.
 
 at 526. He opines that “[p]roper application of the abstractions test is difficult ... because it requires an under
 
 *CMIII
 
 standing of fundamental programming concepts.”
 
 Id.
 
 at 528.
 

 As explained above, the Court concludes that application of the abstraction/filtration/comparison test in the instant case requires expert knowledge in the area of computer programming — a level of knowledge that the Court believes requires a fundamental understanding of computer programming. This knowledge beyond the common knowledge of both a layman and this Court. The defendants have properly proffered experts. The Court granted the defendants’ motion to strike the plaintiffs lone designated expert and his draft report for failure to file a signed expert report in conformity with Federal Rule of Civil Procedure 26(a)(2). The plaintiff has no expert to help explain to the court and the jury how to apply the abstraction/filtration/comparison test to the computer programs in the instant case — or anything other technical aspect of the plaintiffs case. Therefore, the plaintiff is incapable of sustaining his burden of proving his copyright infringement claim and the defendants must be granted summary judgment on this point.
 

 D. Misappropriation of Trade Secrets
 

 The Mississippi Uniform Trade Secrets Act, Mississippi Code Annotated § 75-26-1,
 
 et seq.
 
 is identical to the Uniform Trade Secrets Act, 14 U.L.A. 437 (1990).
 
 Marshall v. Gipson Steel, Inc.,
 
 806 So.2d 266 (Miss.2002). According to the MUTSA, trade secret misappropriation means:
 

 (i) Acquisition of a trade secret of another person who knows or has reason to know that the secret was acquired by improper means; or
 

 (ii) Disclosure or use of a trade secret of another without express or implied consent by a person who:
 

 1.Used improper means to acquire knowledge of the trade secret; or
 

 2. At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
 

 a. Derived from or through a person who had utilized improper means to acquire it;
 

 b. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
 

 c. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
 

 3. Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.
 

 Miss.Code Ann. § 75-26-3(b) (2000). “ ‘Improper means’ includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means.” Miss.Code Ann. § 75-26-3(a) (2000).
 

 Furthermore, a “trade secret” is:
 

 [IJnformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:
 

 (i) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and
 

 (ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
 

 Miss.Code Ann. § 75-26-3(d) (2000).
 

 There are essentially two prongs a plaintiff must establish in order to prove misappropriation of a trade secret in Mississippi. To prove the first prong, the alleged trade secret “must derive economic value, actual or potential, from not being generally
 
 *CMIV
 
 known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use.’ ”
 
 Marshall,
 
 806 So.2d at 271 (quoting Miss.Code Ann. § § 75-26-3(d) (2000)). Moreover, with respect to the phrase “not readily ascertainable by proper means,” “proper means” includes reverse-engineering which consists of “starting with the known product and working backward to find the method by which it was developed.”
 
 Id.
 
 (citing Unif. Trade Secrets Act § 1 emt., 14 U.L.A. at 438). In other words, it is perfectly proper to utilize reverse-engineering to discover the innards of a computer program. To establish the second prong, the court must consider whether the information was “subject to reasonable attempts to preserve its secrecy.”
 
 Id.
 
 at 272.
 

 As to the first prong of the trade secret misappropriation inquiry, the Court concludes that the plaintiffs failure to present an expert would preclude him from the ability to establish that his software in the circumstances was “not being readily ascertainable by proper means by other persons” by reverse engineering.
 
 See Marshall, supra.
 
 Stated differently, the plaintiff as a whole has produced insufficient evidence (other than allegations and conclusions) to prove the first prong of the trade secret misappropriation test.
 

 Likewise, after a thorough search of the record, including the complaint, depositions, and pleadings, the Court concludes as a matter of law that the plaintiff has presented insufficient evidence to establish the second prong of the trade secret misappropriation test. That is, reasonable minds would not differ on the proposition that the plaintiffs efforts to keep his software secret were sorely inadequate. Thus, there is no need for a jury to decide this issue. Despite the existence of the paltry one-paragraph confidentiality agreement signed only by one defendant before the certificate of copyright registration was received, it seems clear that the plaintiff was not diligent in keeping his software secret. Divulging his software to multiple parties not covered by the confidentiality agreement was
 
 per se
 
 unreasonable. This post-agreement tends to invalidate the agreement in itself — or at least pose an evidentiary problem, since it is unlikely the plaintiff can distinguish between what was divulged by the lone signatory to the agreement (i.e., Defendant Lerner) and that by the other people privy to the plaintiffs software (e.g., Defendant Crosslin, Defendant Patton, the investors, etc.). The Court also concludes that even if the defendants gave the plaintiff oral assurances that he would be “taken care of,” such reliance under the circumstances was unreasonable using basic business judgment.
 

 As such, the Court concludes that the defendants should be granted summary judgment on the plaintiffs trade secret misappropriation claim.
 

 E. Remaining Claims
 

 The remaining claims include breach of the confidentiality agreement, tortious interference with that contract, fraud, aiding and abetting, and civil conspiracy. Closely related to the reasons provided above for dismissal of the copyright infringement and misappropriation of trade secret claims, as well as the arguments put forth in the defendants’ motion for summary judgment, these remaining claims are without merit and should also be dismissed. Accordingly, defendants’ should be granted summary judgment as to these claims.
 

 F. Defendants’ Counter-Claim
 

 Because there remains no issues of federal law, the Court declines to exercise supplemental jurisdiction over the defen
 
 *CMV
 
 dants’ counterclaim for conversion of assets pursuant to 28 U.S.C. § 1367(c)(8). The Court notes that the defendants made no mention of their counter-claim in their summary judgment. Therefore, the declination to exercise ancillary jurisdiction over that claim would not be a matter related to summary judgment.
 

 III. CONCLUSION
 

 For the reasons discussed above, the Court concludes that the Defendants’ Motion for Summary Judgment [56-1] should be granted. The Court concludes further that it will not exercise supplemental jurisdiction over the defendants’ counter-claim and will thus dismiss the same. Accordingly, an Order reflecting these conclusions as a matter of law will issue forthwith, THIS DAY of January 15th, 2004.
 

 ORDER GRANTING SUMMARY JUDGMENT
 

 In accordance with a Memorandum Opinion issued on January 15, 2004, it is ORDERED AND ADJUDGED that:
 

 (1) Defendants’ Motion for Summary Judgment [56-1] is hereby GRANTED;
 

 (2) Accordingly, this case is DISMISSED WITH PREJUDICE.