REVISED - September 18, 2000

**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 99-30513

COMPUTER MANAGEMENT ASSISTANCE COMPANY,

Plaintiff-Appellant,

v.

ROBERT F. DeCASTRO, INC., et al.

Defendants,

INFORMATION MANAGEMENT CONSULTANTS & ASSOCIATES, INC.,

Defendant-Appellee.

Appeal from the United States District Court
For the Eastern District of Louisiana

July 25, 2000

Before GARWOOD, DeMOSS and PARKER, Circuit Judges.

ROBERT M. PARKER, Circuit Judge:

Plaintiff-Appellant appeals the district court's entry of judgment for Defendant-Appellee after a bench trial on claims of copyright infringement, trade secret misappropriation and unfair trade practices. We affirm the district court's ruling on these claims. Plaintiff also appeals the district court's award of attorney's fees pursuant to a fee-shifting statute. We express no judgment on the validity of this fee determination and dismiss this portion of the appeal for lack of jurisdiction.

**FACTUAL HISTORY AND PROCEEDINGS BELOW**

Computer Management Assistance Company ("CMAC") developed a

computer program for the picture framing industry named ACCESS. ACCESS is a front-end pricing program that assists distributors in managing sales and facilitating transactions with customers. In 1983, CMAC licensed ACCESS to Robert F. de Castro, Inc., ("deCastro") a major wholesale distributor of picture frames, and trained deCastro's information systems manager, Luis Escalona, ("Escalona") to use ACCESS. Under this license agreement, CMAC placed confidentiality restrictions on deCastro's right to use and disclose ACCESS.[1]

CMAC's package to deCastro included a sublicense of an interpreter, licensed by CMAC to run ACCESS on deCastro's computer. An interpreter translates instructions in a specific program language, in which a programmer has written a program (its "source code"), into a specific numerical language (its "object code") that the computer is built to run on. BUSS also depended on the CMAC licensed interpreter to run on deCastro's computer.

In 1992, Information Management Consultants ("IMC"), a value-added reseller of FACTS, a comprehensive software package for wholesale distributors in general (i.e., not industry

---

[1] In addition to ACCESS, deCastro used a "Backup Stock System" (BUSS) program that was written by Escalona in the same business basic language that ACCESS used. BUSS is a back-end inventory that assists distributors in managing stock. This program kept track of 25,000 boxes of framing and molding in deCastro's inventory. It specified identity, quality and bin location of each item from receipt until sale. BUSS enabled employees to know what was in the warehouse and where to find it.

-2-

specific) contacted deCastro.  The next year, IMC presented a proposal to install and modify FACTS to fit deCastro's needs. This was IMC's inaugural foray into the picture framing industry. A document referred to as "Appendix A" proposed modifications to incorporate deCastro's internal BUSS and interface with deCastro's pricing regime.

In August of 1993, deCastro decided to enter into a new contract with CMAC.  CMAC agreed to try to modify ACCESS to provide direct order entry and for that purpose got from IMC a FACTS demonstration package including that feature.  CMAC was unable to modify ACCESS to satisfy deCastro's need for direct order capability.  DeCastro renewed discussions with IMC and eventually entered into a contract for FACTS that included items from Appendix A.  The uncomplicated modifications were made by adding files (approximately 750 lines of code) to generic FACTS (containing over 600,000 lines of code).  IMC installed the modified FACTS and deCastro began using it in June of 1996. Because FACTS was written in a different language (BBX basic) than ACCESS, IMC also installed another interpreter.  The CMAC software was still installed and the CMAC interpreter was still utilized to run BUSS.

In February of 1997, CMAC filed suit against deCastro, Escalona and IMC[2] alleging copyright infringement, trade secret

_____

[2]  Defendants deCastro and Escalona are no longer parties to this appeal.  All claims against deCastro and Escalona were settled by agreement between the parties.  Their cross appeal

misappropriation, unfair and deceptive trade practices and breach of contract.  After a two-week bench trial, the district court entered judgment against CMAC on all claims.  In addition, the district court awarded attorney's fees against CMAC pursuant to the Copyright Act's fee-shifting provision.  CMAC appeals the district court's dismissal of its claims as against IMC and the award of attorney's fees.

## STANDARD OF REVIEW

"We review the district court's findings of fact for clear error and decide issues of law *de novo*."  *Malchi v. Thaler*, 211 F.3d 953, 956 (5th Cir. 2000).

## DISCUSSION

## I.  Copyright Infringement.

A plaintiff must prove the following elements to succeed on a claim of copyright infringement: (1) ownership of the copyrighted material and (2) copying by the defendant.  *See Alcatel USA, Inc. v. DGI Technologies, Inc.*, 166 F.3d 772, 790 (5th Cir. 1999).  "Copyright ownership is shown by proof of originality and copyrightability in the work as a whole and by compliance with applicable statutory formalities."  *Engineering Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1340 (5th Cir. 1994) (citing *Plains Cotton Coop. Ass'n v. Goodpasture Computer Serv., Inc.*, 807 F.2d 1256, 1260 (5th Cir. 1987)),

---

against CMAC is no longer before us.

-4-

*opinion supplemented on denial of rehearing by* 46 F.3d 408 (5th Cir. 1995).  It is undisputed that CMAC obtained a copyright for ACCESS.

Not all copying by a defendant is actionable as copyright infringement.  "A copy is legally actionable if (1) the alleged infringer actually used the copyrighted material to create his own work, and (2) substantial similarity exists between the two works."  *Alcatel*, 166 F.3d at 790.  The factual question of whether the defendant actually used the copyrighted material can be inferred by showing proof of access to the copyrighted work and probative similarity between the defendant's work and the copyrighted work.  *See Engineering Dynamics*, 26 F.3d at 1340-41 (citations omitted).  The second question is whether the copying is legally actionable.  The inquiry here is whether there is substantial similarity between the two works.  *See id.*

Computer programs are entitled to copyright protection.  *See id.* at 1341; *see also Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255, 259 (5th Cir. 1988) (noting that the Copyright Act was amended in 1976 "to include computer programs in the definition of protectable literary works").  The Copyright Act defines a computer program as "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result."  17 U.S.C. § 101 (1994).  "[C]opyright protection for an original work of authorship [does not] extend to any idea, procedure, process, system, method of operation,

concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b) (1994). In other words, copyright protection does not extend to ideas, *per se*, but to the particular expression of those ideas.

The law in this Circuit lends copyright protection to the non-literal as well as the literal elements of computer programs. *See, e.g.*, *Kepner-Tregoe, Inc., v. Leadership Software, Inc.*, 12 F.3d 527, 536 n.20 (5th Cir. 1994) (embracing the "noncontroversial proposition that non-literal aspects of copyrighted works--like structure, sequence, and organization-- may be protected under copyright law") (citing *Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340 (1991)).

CMAC argues that copyright protection extends to the terms of its literal lines of code and its non-literal elements of architecture, design and coding methodology. Notwithstanding the fact that there is no literal similarity between the code lines of FACTS and ACCESS, CMAC argues that copyright protection was infringed on the non-literal design and organizational elements.

We use the "abstraction-filtration" method to determine copyright protection. *See Engineering Dynamics*, 26 F.3d at 1343. The approach was taken from the Tenth Circuit's analysis in *Gates Rubber Co. v. Bando Chemical Indus., Ltd.*, 9 F.3d 823 (10th Cir. 1993). That court's thoughtful explanation guides our analysis

on this issue:

> First, in order to provide a framework for analysis, we conclude that a court should dissect the program according to its varying levels of generality as provided in the abstractions test. Second, poised with this framework, the court should examine each level of abstraction in order to filter out those elements of the program which are unprotectable. Filtration should eliminate from comparison the unprotectable elements of ideas, processes, facts, public domain information, merger material, *scenes a faire* material, and other unprotectable elements suggested by the particular facts of the program under examination. Third, the court should then compare the remaining protectable elements with the allegedly infringing program to determine whether the defendants have misappropriated substantial elements of the plaintiff's program.

*Gates Rubber*, 9 F.3d at 834, *quoted in Engineering Dynamics*, 26 F.3d at 1342-43.

The *scenes a faire* doctrine excludes from copyright protection work serving functional purposes or work that is dictated by external factors such as particular business practices. The *Gates Rubber* Court articulated the application of this doctrine to copyright issues involving computer programs.

> In the area of computer programs these external factors may include: hardware standards and mechanical specifications, software standards and compatibility requirements, computer manufacturer design standards, target industry practices and demands, and computer industry programming practices.

9 F.3d at 838 (citations omitted), *quoted in Engineering Dynamics*, 46 F.3d at 410 n.2.

### A.    Abstraction.

We must first divide the ACCESS program segments into layers

of abstraction and determine "whether the contents of that segment depict an idea, process or method, which, inseparable from its expression or incapable of expression by any other means" and are therefore not copyrightable. *Engineering Dynamics*, 26 F.3d at 1343.

Appendix A[3] discusses how the generic FACTS system would be modified to incorporate deCastro's method of doing business. CMAC asserts that Appendix A provides ample evidence of a copyright violation. It alleges that Appendix A contains numerous copyrightable design specifications, not just general business practices, which were copied from its program. Specifically, Section Two of Appendix A details the most significant modifications to generic FACTS: those necessary to accommodate deCastro's pricing matrices. The pricing system includes group pricing,[4] customer special pricing[5] and price calculations.[6] Section Four of Appendix A covers corner samples and chop

---

[3] This document is an appended portion of a larger document that constituted IMC's proposal to deCastro.

[4] Discount pricing based on the volume purchased within a user-defined group of items, rather than on the volume of each item itself.

[5] Each customer may have its own pricing of discount schedule.

[6] The pricing hierarchy is the order of precedence of the manually entered price, the customer special price, the group price, the item discount price and the item base price.

handling[7] aspects of deCastro's business.

After a thorough examination of Appendix A and the remainder of the record, we agree with the district court on the initial level of abstraction analysis. The ACCESS program contains several features that qualify as an "expression" of a detailed design specification developed by CMAC in its source code and object code, as well as the non-literal elements of its program, to meet the requirements of the framing industry. Accordingly, the district court properly proceeded to the next stage of the analysis: "filtration."

### B.   Filtration.

"The filtration component of the analysis seeks to isolate noncopyrightable elements from each particular level of a program." *Engineering Dynamics*, 26 F.3d at 1344. Ideas, information, methods, scientific discoveries, facts, information in the public domain and *scenes a faire* are not protected. *See id.* The district court found that the modifications to generic FACTS performed by IMC were dictated by the business practices and demands of deCastro and, therefore, fell within the *scenes a faire* exception.

Section Two of Appendix A discusses what modifications to FACTS were necessary to meet deCastro's needs for maintaining

---

[7]   Corners might be used as samples in a frame shop. The chop service refers to the whole frame, which is cut to size to the customer's request to a sixteenth of an inch, as is standard in the framing industry.

files of its pricing elements: price groups (with price affected by feet purchased), product types (pricing by both type and class of product) and group/product (group discounting for combinations of different items).  Pricing was also unique for certain customers, adjusted by both dollar amount and percentage. Section Four of Appendix A addresses calculation both of the total material used to make a "chop" or corner, and of the lineal length of framing material that remained.

The district court found that Appendix A represents the specific needs of deCastro's business as well as practices that are standard in the picture framing industry.  We agree with this reading and the district court's conclusion that Appendix A is the expression of a theme common in an industry that takes phone orders, prices a product with special rates for particular customers and tracks the inventory available to fill the orders. These elements are dictated by the business practices of the industry in which deCastro engages.  Under the doctrine of *scenes a faire*, those expressions contained in Sections Two and Four of Appendix A that are dictated by these external factors are not subject to copyright protection and are eliminated from consideration in comparing the ACCESS and FACTS programs.

C.    **Substantial Similarity.**

Next we must examine whether the defendant copied any remaining protected aspects of ACCESS, unrelated to the functional purposes excluded from protection by the *scenes a*

*faire* doctrine--i.e., the source code and file layouts for the program, including all designs revealed by the source code and file layouts. *See Engineering Dynamics, Inc.*, 26 F.3d at 1347.

Generic FACTS is a comprehensive program that required few modifications to conform to deCastro's needs, and there is no allegation that generic FACTS incorporates CMAC's proprietary information. The district court found substantial differences when it compared the modified FACTS program with ACCESS. For example, it noted that the two programs are written in different basic languages and have different sequences.

IMC adapted FACTS to fit deCastro's needs by adding simple file maintenance programs, keys and data to the generic FACTS program. The modifications represent a fraction of the generic FACTS source code and are dictated by the structure of generic FACTS. We agree with the district court's finding that the logical way to modify generic FACTS was to add files to accommodate deCastro's particular business practices.

**D.   Misappropriation of Copyrighted Material.**

The district court found that the evidence did not establish that IMC programmers copied the ACCESS program. Testimony at trial revealed that, when IMC installed FACTS on deCastro's computer hardware, CMAC's code was still on the hardware. The district court found that the IMC installer did not see CMAC's code and that he was not attempting to duplicate the methodology because FACTS had its own file layouts. Another witness, who

-11-

performed most of the work for IMC in modifying the FACTS software, testified that he followed Appendix A and developed the file layouts as he wrote the program without using CMAC's file layouts.  He stated that he began with the existing FACTS code and upgraded according to deCastro's business needs when necessary.  The district court found, that this witness did not see CMAC's source code, file layouts, file documentation or contracts.  We find no clear error in these findings.

We agree with the district court's analysis of CMAC's copyright claim against IMC.[8]  Generic FACTS and ACCESS are similar only in that they both serve deCastro's needs when modified to reflect the particular practices of the framing industry and deCastro's business.  Accordingly, CMAC has not demonstrated that FACTS is substantially similar to ACCESS or that the defendants have misappropriated substantial elements of the ACCESS program.

## II.  Misappropriation of Trade Secrets.

CMAC asserts that the complete source code and file layouts for ACCESS and all their revealed designs are trade secrets and that IMC misappropriated those trade secrets in violation of Louisiana law.  In order to recover damages under the Louisiana

---

[8]  Because IMC is the only defendant left on appeal, we speak only to CMAC's claims as they relate to IMC.  This opinion does not examine the district court's findings with respect to any of the other defendants with whom CMAC's has settled.

Uniform Trade Secrets Act,[9] "a complainant must prove (a) the existence of a trade secret, (b) a misappropriation of the trade secret by another, and (c) the actual loss caused by the misappropriation." *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 648 (5th Cir. 1997) (citations omitted). For purposes of this appeal, the following definitions from the statute are relevant:

"Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(a) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and

(b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

LA. REV. STAT. ANN. § 51:1431(4) (West 1987)

"Misappropriation" means acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means . . . by a person who:

(i) used improper means to acquire knowledge of the trade secret; or

(ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

* * *

(bb) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

LA. REV. STAT. ANN. § 51:1431(2)(b) (West 1987).

We agree with the district court that CMAC's trade secret

---

[9] *See* LA. REV. STAT. ANN. §§ 51:1431-39 (West 1987).

claim against IMC fails for the same reason as its copyright claim: lack of proof of misappropriation.[10] The primary reason deCastro changed to FACTS was the need for direct order capability,[11] which ACCESS did not have and could not provide. CMAC's features were of nominal interest to IMC's programmers because ACCESS and FACTS were fundamentally different--FACTS already possessed capabilities that ACCESS did not.

Furthermore, CMAC failed to show that IMC programmers even had an opportunity to see the ACCESS source code until four years after the modifications were completed on generic FACTS.[12]

## III. Unfair Trade Practices.

CMAC alleges that IMC violated the Louisiana Unfair Trade Practices Act ("LUTPA"),[13] by disregarding its intellectual

---

[10] We assume for purposes of argument that the program material at issue constitutes a trade secret. Even though, we dispose of CMAC's trade secret claim for lack of proof of misappropriation, we do not endorse the district court's additional ruling on this issue--i.e., that ACCESS's modules do not constitute trade secret material.

[11] As noted by the district court, direct order entry capability enabled deCastro's telephone operators to take a customer order and quote a price over the telephone. Under the CMAC system, the telephone operator had to write down customer information as she moved from one screen to another while taking an order.

[12] CMAC proffers as evidence that IMC saw the ACCESS source code, the fact that an IMC programmer did, in fact, look at the code during a data conversion in a *subsequent project* for a company called GEMNI. This occurred four years after this same person drafted Appendix A and at least one year after IMC completed its work for deCastro.

[13] *See* LA. REV. STAT. ANN. §§ 51:1418-20 (West Supp. 1999).

property rights to ACCESS when it used Escalona's privileged knowledge of the intricacies of the software. To recover under LUTPA, a plaintiff must prove fraud, misrepresentation or other unethical conduct. *See Schenck v. Living Centers-East, Inc.*, 917 F. Supp. 432, 439 (E.D. La. 1996). "A trade practice is unfair under the statute only when it offends established public policy and is immoral, unethical, oppressive or unscrupulous." *Schenck*, 917 F. Supp. at 439 (citation omitted).

IMC argues that CMAC's unfair trade practices claim is pre-empted in one of two ways. IMC's primary argument is that the Copyright Act's preemption provision, 17 U.S.C. § 301 (1994), bars CMAC's unfair trade practice claim. We have developed a two-part test for analyzing pre-emption claims under § 301 of the Copyright Act.

> First, the cause of action is examined to determine if it falls "within the subject matter of copyright" Second, the cause of action is examined to determine if it protects rights that are 'equivalent' to any of the exclusive rights of a federal copyright, as provided in 17 U.S.C. § 106.

*Daboub v. Gibbons*, 42 F.3d 285, 289 (5th Cir. 1995) (citations omitted). Since CMAC's unfair trade practices claim is based on IMC's alleged copying of a protected computer program, our analysis will focus on whether the cause of action provided by Louisiana's unfair trade practices act is "equivalent" to any exclusive rights provided for in the Copyright Act.

The test in this Circuit for evaluating the equivalency of rights is commonly referred to as the "extra element" test. *See*

*Alcatel*, 166 F.3d at 787.

> According to this test, if the act or acts of [the defendant] about which [the plaintiff] complains would violate both misappropriation law and copyright law, then the state right is deemed "equivalent to copyright." If, however, one or more qualitatively different elements are required to constitute the state-created cause of action being asserted, then the right granted under state law does not lie "within the general scope of copyright," and pre-emption does not occur.

*Id.* (quoting 1 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 1.01[B][1], at 1-13 (1998)). Because a cause of action under the Louisiana Unfair Trade Practices Act requires proof of fraud, misrepresentation or other unethical conduct, *see, e.g.*, *Schenck*, 917 F. Supp. at 439, we find that the relief it provides is not "equivalent" to that provided in the Copyright Act and, thus, it is not pre-empted.

IMC's alternative argument for pre-emption is based on the pre-emptive section of the Louisiana Uniform Trade Secrets Act. That section reads in pertinent part:

> This Chapter displaces conflicting tort, restitutionary, and other laws of this state pertaining to civil liability for misappropriation of a trade secret.

LA. REV. STAT. ANN. § 51:1437 (West 1987). In order to be pre-empted, then, a remedy must "conflict" with the provisions of the trade secret act.

We find that the remedies provided by Louisiana's unfair trade practices statute and those provided in its uniform trade secrets act do not conflict, but merely provide parallel remedies

-16-

for similar conduct.[14]  Therefore, Louisiana's Uniform Trade Secrets Act does not pre-empt CMAC's unfair trade practice's claim against IMC.

The personal right of action under LUTPA applies only to direct consumers or to business competitors.  *See, e.g.*, *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 975 F.2d 1192, 1205 (5th Cir. 1992); *National Gypsum Co. v. Ace Wholesale, Inc.*, 738 So. 2d 128, 130 (La. Ct. App. 5th Cir. 1999); *Thibaut v. Thibaut*, 607 So. 2d 587, 607 (La. Ct. App. 1st Cir.), *writ denied by* 612 So. 2d 38 (La. 1993); *Gil v. Metal Serv. Corp.*, 412 So. 2d 706, 707 (La. Ct. App. 4th Cir. 1982), *write denied by* 414 So. 2d (La. 1987).  CMAC has standing to assert a claim against IMC because IMC is a direct competitor of CMAC.

We agree with the district court's finding that CMAC has not alleged any claims of fraud or misrepresentation on the part of IMC.  We fail to see where the "record clearly shows that IMC

---

[14]  Since this is a question of state law interpretation, we examined Louisiana cases law on this issue and found no case exactly on point, but did find a number of cases allowing plaintiffs to assert a cause of action under each statute.  *See, e.g.*, *Boncosky Services, Inc. v. Lampo*, 751 So.2d 278 (La. App. 1st Cir. 1999), *writ denied by* --- So. 2d ---, No. 2000-0322, 2000 WL 365733 (La. Mar 23, 2000); *A Confidential Limousine Service, Inc. v. London Livery, Ltd.*, 612 So. 2d 875 (La. App. 4th Cir. 1993), *writ denied by* 614 So. 2d 1263 (La. 1993), *accord Konecranes, Inc. v. Robina*, No. 98-2997, 1998 WL 812447, at *2 (E.D. La. Nov. 17, 1998).  *Cf. Troxler Electronic Lab., Inc. v. Palilla*, No. 316518, 1995 WL 299599, at *2 (Conn. Super. Ct. May 10, 1995) (noting that "since CUTPA provides a remedy parallel to [the] Uniform Trade Secrets Act, causes of action under both statutes may be maintained").

conspired" with the other defendants to "misappropriate proprietary information, transfer trade secrets and infringe copyrightable elements of CMAC's software." Finding no evidence of a conspiracy between IMC and the other defendants, the only question is whether INC, as a competitor of CMAC, engaged in "other unethical conduct."

Because the district court's finding that IMC did not copy ACCESS in modifying FACTS was not clearly erroneous, we fail to see any evidence of unethical conduct on the part of IMC in modifying generic FACTS for use by deCastro that would bring it within the unfair trade practices statute.

## IV.  Award of Attorney's Fees.

The defendants in this case, including IMC, moved the court for an award of attorney's fees pursuant to the Copyright Act's fee shifting section.[15]  The district court awarded the defendants attorney's fees.  Because the district court referred the amount of award of attorney's fees to the magistrate judge, the order awarding such fees is not final.  *See DeLoach v. Delchamps, Inc.*, 897 F.2d 815, 826 (5th Cir. 1990) ("Because a judgment is not final until both liability and damages are determined, a judgment awarding an unspecified amount of attorney's fees is interlocutory in nature.")*; see also Liberty Mut. Ins. Co. v. Wetzel*, 424 U.S. 737, 743-44 (1976).

---

[15]  *See* 17 U.S.C. § 505 (1994).

-18-

Therefore, we dismiss the portion of the appeal regarding attorney's fees for want of jurisdiction.

## CONCLUSION

For the foregoing reasons we affirm the judgment of the district court save the portion on attorney's fees.  We dismiss the appeal on the issue of attorney's fees for lack of jurisdiction.


AFFIRMED, in part, appeal DISMISSED, in part.