# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 24, 2008

Charles R. Fulbruge III
Clerk

No. 06-31180

THEODORE KNATT

Plaintiff

v.

HOSPITAL SERVICE DISTRICT NO. 1 OF EAST
BATON ROUGE PARISH, ETC., ET AL

Defendants

-------------------------------------------------------------------------------------------------------------

THEODORE KNATT

Plaintiff - Appellant

v.

HOSPITAL SERVICE DISTRICT NO. 1 OF EAST BATON ROUGE PARISH,
a political subdivision of the Parish of East Baton Rouge, State of Louisiana,
doing business as Lane Memorial Hospital; BOARD OF COMMISSIONERS
OF HOSPITAL SERVICE DISTRICT NO. 1 OF EAST BATON ROUGE
PARISH, LOUISIANA, a political subdivision of the Parish of East Baton
Rouge, State of Louisiana, doing business as Lane Memorial Hospital;
RANDALL OLSON

Defendants - Appellees

Appeal from the United States District Court
for the Middle District of Louisiana, Baton Rouge
No. 3:05-CV-351

Before KING, HIGGINBOTHAM, and SOUTHWICK, Circuit Judges.

PER CURIAM:[*]

Plaintiff-appellant Dr. Theodore Knatt appeals the judgment dismissing his claims against all defendants-appellants arising from an alleged breach of lease and wrongful eviction by defendant-appellant Hospital Service District No. 1 of East Baton Rouge Parish, d/b/a Lane Memorial Hospital. For the reasons stated below, we affirm the district court's judgment.

## I. BACKGROUND

This is the second of two lawsuits involving the plaintiff and most of the defendants. The first lawsuit centers around the summary suspension of Dr. Theodore Knatt's medical privileges, whereas this second suit is primarily based upon the alleged breach of Knatt's lease and wrongful eviction. We shall discuss the facts and circumstances of the first lawsuit, which was consolidated with this case below but resolved by the district court after this case, only inasmuch as it is necessary to provide context to this case.

In or around 1995, Knatt became the first full-time African-American physician and orthopedic surgeon in the community of Zachary, Louisiana, when he contracted to provide services to patients of Hospital Service District No. 1 of East Baton Rouge Parish, State of Louisiana, a political subdivision of the Parish of East Baton Rouge, d/b/a Lane Memorial Hospital ("Lane"). In January 1998, Knatt leased office space from Lane pursuant to a written lease agreement (the "1998 lease"). The 1998 lease had a term of twelve months beginning on February 1, 1998. It also contained an automatic renewal clause for an additional three years, with the last term set to expire on January 31, 2002. Either party had an option to terminate the 1998 lease by providing written notice at least sixty days before expiration of the final lease term. The rent for

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

the last term, February 1, 2001 through January 31, 2002, was $1,954 per month.

In March 2001, Knatt informed Lane's CEO, Terry Whittington, that he was a primary owner spearheading the development of the Howell Place Project, a physician-owned surgical facility. The 48,000 square foot facility would be located approximately ten miles south of Lane. Knatt later described the Howell Place Project as a competitor of Lane's for "patient dollars," but initially invited Lane to invest in the venture. Lane's Board of Commissioners voted against investing in the Howell Place Project, although it did offer to manage the proposed hospital. The Howell Place Project declined Lane's offer of management services.

On November 29, 2001, Whittington sent Knatt a proposed new lease (the "2002 lease"), which Whittington had already signed, because the final term of the 1998 lease was set to expire on January 31, 2002. The 2002 lease was to begin on February 1, 2002, and expire on January 31, 2003. The 2002 lease provided for five optional renewal terms of one year each, requiring 180 days' prior written notice for renewal. The base rent under the proposed 2002 lease was $1,875 per month, slightly less than the rate in the 1998 lease. But, under the terms of the 2002 lease, housekeeping, janitorial, and laundry services, which were included in the rent under the 1998 lease, were only available at an additional cost. Overall, if Knatt continued to use these services, the 2002 lease rate was higher than the 1998 lease rate. It is disputed whether Knatt signed and returned the 2002 lease to Whittington or otherwise agreed to its terms. Regardless, Lane continued to occupy the office space and continued to pay $1,954 a month in rent.

Knatt alleged that Lane retaliated against him for his participation in the Howell Place Project by conspiring against him and attempting to harm his professional reputation. He also claimed that a pattern of racial discrimination

against him, which had always existed, escalated. Amongst other things, Knatt contended that complaints from nurses—that Knatt was abusive to staff and at other times seemed impaired while performing surgical procedures—were part of a coordinated campaign to defame his reputation and undermine the Howell Place Project. Ultimately, as a result of the complaints, at a May 8, 2002, meeting of Lane's Executive Bylaws Committee, Knatt was summarily suspended from medical staff privileges for twenty-one days. Knatt's privileges were later reinstated, and the summary suspension was removed from his record. However, on May 5, 2003, Knatt filed the first of two lawsuits against Lane and several of its agents and employees in Louisiana state court. Knatt asserted eleven claims that arose out of the events leading up to his suspension, including claims under the Louisiana Unfair Trade Practices and Consumer Protection Act ("LUTPA"), LA. REV. STAT. ANN. § 51:1401, et. seq., and 42 U.S.C. §§ 1983 and 1985. The defendants removed the case to federal court on June 4, 2003.

In September of 2003, Knatt resigned his medical privileges to practice at Lane. Shortly thereafter, Lane recruited Dr. Brian Kozar, a Caucasian male, to replace Knatt. And, at the end of 2003, Lane decided it would no longer lease the office space to Knatt. By certified letter dated November 19, 2003, Randall Olson, Lane's new CEO, notified Knatt that Lane would no longer continue to lease the office space to him. Olson claimed that Knatt was continuing to lease the space on a month-to-month basis pursuant to the terms of the 1998 lease, writing that "[i]n accordance with your [1998] lease, . . . this notice will serve as our sixty (60) day written notice to exercise our option to terminate this lease on January 31, 2004." The letter was returned to Olson as undeliverable and resent on December 9, 2003.

On January 23, 2004, Knatt's attorney responded by letter, asserting that Lane and Knatt had entered into a new lease, the 2002 lease. A copy of the 2002

lease was attached that bore both Whittington's and Knatt's signature; however, Knatt's signature was undated. Knatt's attorney also claimed in his response that the 2002 lease was still effective because Knatt hand delivered written notice to Whittington, on April 17, 2003, indicating that he was exercising an option to renew. A copy of this letter was also attached. Finally, Knatt's attorney concluded by stating, "I would appreciate your written acknowledgment that Dr. Knatt will not be evicted, nor will any attempt be made to evict Dr. Knatt on or after February 1, [2005] . . . ."

On February 4, 2004, Olson replied to Knatt's request by assuring him that "Lane . . . has not taken any action to evict Dr. Knatt from the medical office space he leases from [Lane]." On the other hand, Olson disputed Knatt's claim that the 2002 lease was effective. He stated: "[e]ven though Dr. Knatt may have signed this lease . . . , copies were never received in the Administrative Office. We also have no record of Dr. Knatt's letter of April 17, 2003, exercising an option to extend the lease." Olson further stated that the amount that would have been due under the 2002 lease was more than Knatt had paid. Specifically, if Knatt had been paying the base amount owed under the 2002 lease plus the additional cost of the separate services, Knatt would have owed an additional $6,774.15. Olson suggested that "[i]f there is any desire to work toward a solution on this issue, Dr. Knatt needs to be current on all payments. After that, we can entertain discussion on a lease renewal."

Olson and Knatt's attorney continued to negotiate until they reached a partial understanding. Knatt refused to waive any rights, but agreed at least to pay the additional amount that would have been due under the 2002 lease. This was memorialized in a letter that Knatt's attorney sent to Olson on February 26, 2004, wherein he stated:

> Dr. Knatt, while reserving all rights and claims, including the right to continue to dispute his legal liability for all or any portion of the $6,774.15 as set

forth in your letter . . . , has advised me that he will make that payment (reserving the right to recoup all or a portion of that sum) . . . .

This will also confirm our conversation and agreement that if such payment is made, Dr. Knatt will be allowed to remain on the premises at least through March 31, 2004. As you know, it is Dr. Knatt's position that he has the legal right to remain in the premises at least until January 31, 2005.

It is Dr. Knatt's desire that on or before March 31, the lease dispute can be resolved with an agreement that Dr. Knatt has renewed the lease, through January 31, 2005, and has the option to renew thereafter.

On March 9, 2004, Olson responded by letter, acknowledging receipt of the payment but reconfirming Lane's position that Knatt never agreed to the 2002 lease or sought to exercise an option to renew "until after the hospital elected to terminate the [1998] lease in November of last year." Moreover, Olson formally notified Knatt that he must vacate the premises, stating: "[w]e hereby demand that you vacate the office . . . not later than March 17, 2004. . . . If satisfactory accommodations are not reached by March 17, 2004, we intend to immediately proceed with eviction proceedings."

Nevertheless, the parties continued to negotiate in an attempt to settle their dispute. Finally, Knatt agreed to vacate the premises. On March 19, 2004, Knatt's counsel stated in a letter to Lane: "I have spoken with Dr. Knatt and he has agreed to vacate the space on April 30, 2004, as discussed." On April 30, 2004, Knatt vacated the premises. However, Knatt refused to sign an agreement releasing Lane from any potential claims arising from the dispute.

On April 22, 2005, Knatt filed this second lawsuit against Lane, Lane's Board of Commissioners, and Olson in the 19th Judicial District Court for the

Parish of East Baton Rouge, State of Louisiana.[1]  Knatt alleged that Lane breached his lease and wrongfully evicted him.  In addition, Knatt alleged that all of the defendants conspired to compel Knatt to surrender his medical office space in order to "destroy [Knatt] as a business competitor" in violation of LUTPA.  Finally, Knatt alleged claims under §§ 1983 and 1985 against all of the defendants for violation of his federal rights.  Importantly, Knatt limited the action to events that occurred after the first lawsuit, averring that "[s]ince the prior actions in the conspiracy are being adjudicated in another lawsuit, the actions in this lawsuit occurred after [that] suit was filed in federal court and possibly too late to amend the federal court pleadings to include these claims."

On May 11, 2005, the defendants removed the case to federal court under 28 U.S.C. § 1441(c).  The district court sua sponte consolidated this case with the first lawsuit on May 12, 2005.  On June 19, the defendants moved to dismiss all causes of action in this case or, in the alternative, for summary judgment.  The defendants argued that there was no wrongful eviction because:  (1) Knatt voluntarily vacated the office space; (2) Knatt never agreed to the 2002 lease; and (3) Knatt never provided written notice to renew the purported 2002 lease 180 days before the end of the 2002 lease's first term.  In support, the defendants submitted an affidavit from Olson, wherein he testified that, according to Lane's staff, Knatt did not agree to the 2002 lease because Knatt objected to some of the new terms, including the provisions in the proposed lease requiring Knatt to reimburse Lane for services.  Olson also testified that at no point before the dispute began did Knatt pay, or offer to pay, rent based on the proposed 2002 lease.  Next, the defendants argued that Knatt failed to state a cause of action under LUTPA because:  (1) Knatt was neither Lane's customer nor business

---

[1] On the same day that Knatt filed this second suit, he also moved the district court for permission to amend the first lawsuit to include additional allegations and claims based on his dispute with Lane concerning the lease.  However, the motion was denied on April 26, 2005, because the "facts [were] too removed from the facts contained in the petition."

competitor at the time his lease was terminated; and (2) LUTPA does not provide a remedy for a mere breach of lease. Finally, the defendants argued that Knatt's §§ 1983 and 1985 claims should be dismissed for failure to state a claim because Knatt's allegations were too conclusory.

Knatt responded to the defendants' motion on July 10, 2006, arguing that it should be construed as a motion for summary judgment because affidavits and other materials (primarily the correspondence between the parties) were attached. Knatt asserted that material issues of fact existed concerning the breach-of-lease claim because: (1) Knatt provided a signed copy of the 2002 lease and the April 17, 2003, renewal letter; (2) Olson was not Lane's CEO at the relevant time, so he could not testify from personal knowledge whether either the 2002 lease or the April 17, 2003, renewal letter was delivered; (3) Olson ratified the 2002 lease by accepting payment constituting the difference owed under the 2002 lease and that paid under the 1998 lease; and (4) Knatt was constructively evicted by Olson's threats of eviction and refusal to confirm renewal of the 2002 lease term. Moreover, Knatt claimed that his LUTPA claims should not be dismissed because: (1) LUTPA actions are not limited to consumers and competitors; and, (2) regardless, as a primary owner of the Howell Place Project, he was Lane's business competitor. In support of his §§ 1983 and 1985 claims, Knatt argued that there was a genuine issue of fact concerning whether he was subject to racial discrimination. He relied on tape recorded conversations with two members of the Board of Commissioners, which he claimed proved that he was targeted by Lane on account of his race. Finally, Knatt argued for the first time that Olson and the Board of Commissioners should not be dismissed because they tortiously interfered with his lease.

On September 20, 2006, the district court heard oral argument on the motion to dismiss. Thereafter, the district court entered an oral ruling against Knatt on all counts, stating:

"It is my conclusion that the lease, the [2002] lease, was never in effect. The second lease was never in effect.

For, basically, the reasons set forth in the memorandum of the defendants, I will dismiss all of the claims in this case. I do not find that there is any basis under the LUTPA, nor is there any basis under the 1983 claims.

The evidence here leads me to conclude that Dr. Knatt never entered into the second lease. In the event that he did, there is nothing before me in the summary judgment evidence that leads me to believe that Dr. Knatt did not voluntarily leave the premises.

The district court also issued a short written order that same day stating that it granted the defendants' motion to dismiss all of Knatt's claims and, on October 18, 2006, entered a final judgment in this case. This timely appeal followed.[2]

## II. DISCUSSION

We review a grant of summary judgment de novo, viewing all the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. See Crawford v. Formosa Plastics Corp., 234 F.3d 899, 902 (5th Cir. 2000) (citations omitted). Summary judgment is proper when the evidence reflects no genuine issues of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). "A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" Crawford, 234 F.3d at 902 (quoting

---

[2] Along with the claims raised in his complaint that we address below, Knatt argues that the district court erred in dismissing a tortious interference claim against Olson and the Board of Commissioners. We need not consider whether the evidence establishes such a claim, however, because it was raised for the first time in Knatt's opposition to the defendants' motion to dismiss or, in the alternative, for summary judgment. See Seatrax, Inc. v. Sonbeck Int'l Inc., 200 F.3d 358, 368 (5th Cir. 2000).

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "Even if we do not agree with the reasons given by the district court to support summary judgment, we may affirm the district court's ruling on any grounds supported by the record." Berquist v. Wash. Mut. Bank, 500 F.3d 344, 349 (5th Cir. 2007) (citation and internal quotation marks omitted).

A. Wrongful Eviction

Knatt argues that the district court erred in entering summary judgment against him on his wrongful eviction claim. First, Knatt asserts that a genuine issue of fact exists concerning whether he entered and renewed the 2002 lease. While acknowledging that the defendants claim that he never provided a signed copy of either the 2002 lease or the April 17, 2003, renewal letter until after this dispute arose, he contends that the only competent summary judgment evidence is his own affidavit testimony stating that he delivered both documents to Whittington. Knatt argues that Olson's affidavit testimony to the contrary is insufficient because Olson was not Lane's CEO during the relevant time period. Second, Knatt asserts that even if the 2002 lease was not originally executed, the district court erred in finding that Lane did not ratify the 2002 lease by accepting rent from Knatt according to the terms of the 2002 lease. Finally, Knatt contends that the district court erred in holding that he voluntarily abandoned the premises because Knatt offered affidavit testimony proving that he only left under duress and, "if Lane truly believed that [Knatt] was voluntarily vacating his office space, Lane would not have requested that [Knatt] sign a written agreement absolving Lane of liability for evicting [him]."

We need not discuss each of these arguments, however, because we conclude that even assuming, arguendo, that the 2002 lease was immediately accepted, signed, and delivered by Knatt to Whittington, it expired at the end of

its first term on January 31, 2003. Under Louisiana law, "[t]he duration and the conditions of leases are generally regulated by contract, or by mutual consent." Sizeler Hammond Square Ltd. P'ship v. Gulf States Theatres, Inc., 836 So. 2d 256, 260 (La. Ct. App. 2002) (citing LA. CIV. CODE ANN. art. 2684). "[T]he option or right to renew a lease is never presumed." Hildalgo Motors, Inc. v. Opelousas Courtesy Motors, Inc., 576 So. 2d 1086, 1087 (La. Ct. App. 1991) (citation omitted). Accordingly, parties to a lease "must abide by the agreement as fixed at the time of the lease." Sizeler Hammond Square Ltd. P'ship, 836 So. 2d at 260 (citing LA. CIV. CODE ANN. art. 2686). If a lease requires written notice of an intention to renew, and only untimely notice is provided, the attempted renewal of the lease is not valid. Id. (citing Hildalgo Motors, Inc., 576 So. 2d 1086; S. Ventures Corp. v. Texaco, Inc., 372 So. 2d 1228 (La. 1979)). Increased rental payments made after the lease expires do not amount to an exercise of the lessee's option to renew. Heirs of Boudreaux v. Payne, 773 So. 2d 894, 897 (La. Ct. App. 2000) (citing Hildalgo Motors, Inc., 576 So. 2d 1086).

Should a tenant fail to give timely notice of intent to exercise a renewal option but nevertheless continue in his possession of the property for a week after his lease has expired, without any opposition being made by the lessor, it is presumed that reconduction occurs. Sizeler Hammond Square Ltd. P'ship, 836 So. 2d at 259 (citing LA. CIV. CODE ANN. art. 2689). "[R]econduction is a continuation of the lease under the same conditions of the old lease except the term. The new term is month to month." Id. (citing LA. CIV. CODE ANN. arts. 2685 and 2689); see also Governor Claiborne Apartments, Inc., v. Attaldo, 235 So. 2d 574, 224-25 (La. 1970) ("Reconduction in Louisiana does in fact make all of the provisions of the original lease applicable and effective except that for term of duration.").

In Southern Ventures Corp., the Louisiana Supreme Court held that when the exercise of a renewal option was untimely effected, the lease was not

renewed for a fixed term but continued on a month-to-month basis. 372 So. 2d at 1230. The court of appeals had held that the lessee's untimely notice, when combined with the lessor's acceptance of continued payment, constituted an effective exercise of the renewal option. Id. But the Louisiana Supreme Court disagreed and held that "subsequent acceptance of the rental payments should not be construed as implying an agreement to extend the time for the exercise of the option in some other way which would be at variance with [the] agreement." Id. Because the tenant's lease in that case was on a month-to-month basis, the lessor was within its rights to terminate the lease at any time. Id.

Similarly, in Hildalgo, a Louisiana court of appeals held that a lessee did not renew his lease because he failed to give written notice not less than sixty days prior to the expiration of the original term as required by the lease. 576 So. 2d at 1087-88. The renewal option in that case included an increased rental rate, and the tenant did in fact begin paying the increased amount after the expiration of the original term. Id. at 1087. Nevertheless, the court held that making the increased payments did not satisfy the unambiguous sixty-day notice requirement for renewal. Id. 1088.

Applying these principles here, while assuming that the 2002 lease was originally effective, the 2002 lease expired at the end of its first term on January 31, 2003. The 2002 lease required written notice of intent to renew 180 days in advance of each new term. Although Knatt offered evidence that he provided written notice on April 17, 2003, to renew the 2002 lease for the second renewal term (February 1, 2004 to January 31, 2005), he did not submit any corresponding evidence that he provided written notice to renew the lease for the first renewal term (February 1, 2003 to January 31, 2004). Knatt testified in his affidavit that he renewed the lease before 180 days of the expiration of the original term, but he did not claim that he gave written notice to Lane. On the

other hand, Olson provided affidavit testimony that Lane received no such written notice.

Accordingly, we conclude that the option to renew for the first renewal term was never effected, and Knatt's lease was reconducted on a month-to-month basis. See Metairie PJ's, Inc. v. Richards Clearview, L.L.C., 963 So. 2d 548, 551 (La. Ct. App. 2007) (holding that a lease expired on its own terms because the lessee's initial notice of intent to renew was not in writing, and its written notice of intent to renew was untimely). Furthermore, it follows that Knatt's later attempt to renew the 2002 lease on April 17, 2003, was untimely and ineffective. See Sizeler Hammond Square Ltd. P'ship, 836 So. 2d at 260 (holding that a lease expired on its own terms because the lessee's untimely notice of intent to renew was insufficient to exercise the renewal option); Heirs of Boudreaux, 773 So. 2d at 897 (same). As such, Knatt continued to possess the office space on a reconducted month-to-month basis subject to termination by notice of either party. See S. Ventures Corp., 372 So. 2d at 1230.

In addition, we agree with the district court's conclusion that Lane did not ratify the renewal of the 2002 lease by accepting payment for the difference in rent owed under the 2002 lease from that paid under the 1998 lease rate. First, Knatt's reliance on the doctrine of ratification is misplaced. Under Louisiana law, a contract that is "relatively null," meaning it is invalid because it "violates a rule for the protection of private parties, as when a party lacked capacity or did not give free consent at the time the contract was made," may be ratified. LA. CIV. CODE ANN. art. 2031; see also Meaghan Frances Hardcastle Trust v. Fleur De Paris, LTD., 917 So. 2d 448, 450-51 (La. Ct. App. 2005) (renewal contract required ratification because it was not signed by all of the parties to the original lease); Cambe Geological Servs. Inc. v. Barrone Dev., L.L.C., No. Civ. A. 98-0893, 2000 WL 377821, at *4 (E.D. La. Apr. 12, 2000) (unpublished) (contract required ratification because purchasor of the building did not assume the lease in the

deed of conveyance); Kavanaugh v. Berkett, 407 So. 2d 645, 648 (La. Ct. App. 1981) (contract required ratification because landlords were minors at the time the lease was signed). But here, even assuming the 2002 lease was effective, it was not relatively null, rather it simply expired on its own terms because the option to renew was not timely exercised.

Second, Lane expressly refused to ratify the 2002 lease. Knatt contends that an intent to ratify a new lease is evident from the parties' correspondence. Yet the correspondence shows the opposite. The letters that Olson wrote on behalf of Lane clearly state that Olson considered payment a necessary precondition for further negotiations concerning Knatt's continued possession of the office space. More importantly, Knatt indicated that he too understood that payment would not vest him with a right to continue to possess the premises. In the very same February 26, 2004, letter in which Knatt's attorney stated that Knatt was willing to pay Lane past rent, he commented that it was "Knatt's desire that . . . the lease dispute can be resolved with an agreement that Dr. Knatt has renewed the lease, through January 31, 2005, and has the option to renew thereafter." Thus, Knatt knew that his payment of additional rent did not constitute a ratification of any agreement. Consequently, his claim for wrongful eviction was properly dismissed.

B. LUTPA Claims

Knatt argues that the district court erred in dismissing his claim for unfair or deceptive trade practices under LUTPA. Because the district court entered judgment "[f]or, basically, the reasons set forth in the memorandum of the defendants," Knatt addresses both arguments presented by the defendants below, namely that: (1) Knatt was not protected by LUTPA because he was neither Lane's customer nor business competitor; and (2) a mere breach of a lease is not an unfair or deceptive trade practice.

First, with respect to the scope of LUTPA, Knatt argues that LUTPA protects a broader class of plaintiffs than customers and business competitors. Regardless, he also contends that he was Lane's competitor because he was a primary owner of the Howell Place Project. Knatt asserts that other adverse conduct that Lane took against him, including some of the actions that constitute the basis for his first lawsuit, proves that Lane viewed him as a competitor. Second, with respect to whether Lane's conduct was an unfair or deceptive trade practice, Knatt argues that his claim was for more than a mere breach of lease. He contends that "[t]he basis for the suit [was] the defendant's refusal to continue to lease office space to [Knatt] as part of . . . the defendant's desire to monopolize, or combine or conspire to monopolize the medical trade, [and to] destroy [Knatt] as a business competitor . . . ."

LUTPA declares that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" are illegal. LA. REV. STAT. ANN. § 51:1405(A). It provides that "[a]ny person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, act, or practice" may recover damages. § 51:1409(A). To recover damages, "a plaintiff must prove fraud, misrepresentation or other unethical conduct." Computer Mgmt. Assistance Co. v. Robert F. DeCastro, Inc., 220 F.3d 396, 404 (5th Cir. 2000) (citation omitted). Further, a "trade practice is unfair under the statute only when it offends established public policy and is immoral, unethical, oppressive or unscrupulous." Id. (citation and internal quotation marks omitted).

"Louisiana has left the determination of what is an 'unfair trade practice' largely to the courts to decide on a case-by-case basis." Turner v. Purina Mills, Inc., 989 F.2d 1419, 1422 (5th Cir. 1993) (citing Marshall v. Citicorp Mortgage

Inc., 601 So. 2d 669, 670 (La. Ct. App. 1992)). However, we have previously discussed conduct that is not prohibited under LUTPA, explaining that:

> LUTPA does not prohibit sound business practices, the exercise of permissible business judgment, or appropriate free enterprise transactions. The statute does not forbid a business to do what everyone knows a business must do: make money. Businesses in Louisiana are still free to pursue profit, even at the expense of competitors, so long as the means used are not egregious. Finally, the statute does not provide an alternate remedy for simple breaches of contract. There is a great deal of daylight between a breach of contract claim and the egregious behavior the statute proscribes.

Id. (emphasis added) (citations omitted). Moreover, we have observed that "an intent to eliminate the competition does not by itself violate LUTPA. Rather, the statute forbids businesses to destroy each other through improper means." Id. at 1423 (emphasis in original).

In the instant case, even assuming that Knatt was protected against unfair or deceptive trade practices by the defendants under LUTPA, we agree with the district court's judgment.[3] The only conduct that Knatt complains of in this case is the refusal to continue to lease office space. Yet this is not an unfair or deceptive trade practice. See id. at 1423-24 (holding that LUTPA did not prohibit the defendant from cancelling a dealership agreement where the contract was terminable at the will of either party); Vermillion Hosp., Inc. v. Patout, 906 So. 2d 688, 694-95 (La. Ct. App. 2005) (holding that a hospital's refusal to lease space to a competing hospital was not an unfair trade practice even if its decision was an unsound business judgment). Knatt complains that the refusal to lease was part of an overall scheme intended to harm his and the

---

[3] We refrain from considering whether Knatt was protected by LUTPA in general because that issue is also in dispute in the first lawsuit, and it is not necessary to resolve the issue here. We need only consider whether Lane's refusal to continue to lease the office space was an unfair or deceptive trade practice.

Howell Place Project's business, but the means he complains of are not forbidden. See Turner, 989 F.2d at 1423.

C. Section 1983 and 1985 claims

Knatt asserts that the district court erred in dismissing his §§ 1983 and 1985 claims. Knatt apparently contends that the district court dismissed both claims for a failure to state a cause of action. He states that the district court erred in holding that he did not state a cause of action, notes that the defendants moved to dismiss on that basis, and argues that the defendants submitted no summary judgment evidence in opposition to his §§ 1983 and 1985 claims. However, Knatt does not address the sufficiency of his pleadings. Instead, he argues that the district court's decision should be reversed because the defendants failed to contest any facts alleged by Knatt and did not sustain their burden of proof.

Based on the defendants arguments below and the lack of summary judgment evidence on these issues, we shall treat the dismissal of the §§ 1983 and 1985 claims as a dismissal for failure to state a claim. We review the grant of a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure de novo. Kennedy v. Chase Manhattan Bank USA, NA, 369 F.3d 833, 839 (5th Cir. 2004) (citations omitted). We must construe the complaint in the light most favorable to the plaintiff and draw all reasonable inferences in the plaintiff's favor. See Lovick v. Ritemoney, Ltd., 378 F.3d 433, 437 (5th Cir. 2004) (citation omitted). To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. at 1965 (quotation marks, citations, and footnote omitted); see also In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 n.10 (5th Cir. 2007) (citation omitted)

(stating that we no longer apply the minimal standard of adequate pleading set forth in Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

We find no basis upon which relief can be granted under § 1983 from the vague and conclusory allegations in the complaint. Knatt alleged, while acting under color of state authority, the defendants:

> caused [Knatt] to be subjected to a deprivation of due process through the acts alleged in paragraphs 66(a) through 66(g) which are realleged and incorporate[d] . . . by reference as though fully set forth herein[,] and by summarily suspending his right to practice medicine and to freely enter into trade and commerce in the Parish of East Baton Rouge and the community of Zachary, Louisiana.

The paragraphs that Knatt sought to incorporate—paragraphs 66(a) through 66(g)—do not appear in his complaint in this case or even in his complaint in the first lawsuit. Furthermore, while the allegations seemingly consist of the same due process violations complained of in his first lawsuit, the complaint elsewhere limits the case to events arising after the first lawsuit was filed. Knatt also argues on appeal that he was discriminated against on the basis of his race in violation of § 1983 because Lane refused to renew the lease and later leased the space to a Caucasian doctor. But this allegation does not appear in the complaint. Rather than offering facts necessary to support a discrimination claim, Knatt made insufficient conclusory accusations.

Similarly, we find that Knatt has not pleaded sufficient facts to state a claim for conspiracy under § 1985. "Plaintiffs who assert conspiracy claims under civil rights statutes must plead the operative facts upon which their claim is based. Bald allegations that a conspiracy existed are insufficient." Lynch v. Cannatella, 810 F.2d 1363, 1369-70 (5th Cir. 1987); see also Young v. Biggers, 938 F.2d 565, 569 & n.6 (5th Cir. 1991) (holding that the plaintiff failed to allege any operative facts because the complaint lacked any specific allegations

connecting the defendants to a conspiracy). In the instant case, Knatt merely alleged that "defendants entered into a conspiracy with a purpose of depriving [Knatt] of equal protection of the law . . . ." He did not allege any specific operative facts establishing the existence of a conspiracy.

## III. CONCLUSION

For the reasons stated above, we AFFIRM the district court's judgment.